# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3108

_____

United States of America,      *

        Appellee,     *

      v.     *

Bryan Austin Boneshirt,     *

        Appellant.     *

* Appeal from the united States
* District Court for the
* District of South Dakota.

_____

Submitted: March 17, 2011
Filed: October 31, 2011

_____

Before SMITH, BRIGHT, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Brian Boneshirt pleaded guilty, pursuant to a written plea agreement, to one count of second degree murder, in violation of 18 U.S.C. §§ 1153 and 1111. The district court[1] sentenced him to 576 months' imprisonment. On appeal, Boneshirt challenges the substantive reasonableness of his sentence. We affirm.

_____

[1] The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota.

## I. *Background*

On November 1, 2009, Boneshirt, then 17 years old, killed Marquita Walking Eagle. The night before, Boneshirt had consumed alcohol and partied with friends in St. Francis, South Dakota, on the Rosebud Indian Reservation. He continued to drink into the early morning hours, sleeping only for a couple of hours before resuming his drinking and partying. At some point on November 1, Walking Eagle, a 19-year-old, arrived at the party. She and Boneshirt left the party and eventually went, alone, to an abandoned house in St. Francis.

Inside the abandoned house, Boneshirt and Walking Eagle began to have consensual sexual intercourse. While doing so, Boneshirt called Walking Eagle by another female's name. She became upset and struck Boneshirt twice. Boneshirt retaliated by striking her head and body, restraining her hands, grabbing her by the neck, and choking her until she became unresponsive. According to Boneshirt, when he noticed that Walking Eagle had stopped breathing, he "panicked" and moved her to another room in the abandoned house, concealing her body with a curtain. Shortly thereafter, Boneshirt's father stopped by the abandoned house and talked with Boneshirt. Boneshirt did not tell his father anything about Walking Eagle.

Boneshirt then left the abandoned house, with Walking Eagle's body still concealed inside. He walked to his father's residence, where he told his brother that he thought he had killed Walking Eagle. Boneshirt's brother then went to the abandoned house to check on Walking Eagle. While waiting on his brother, Boneshirt packed a bag of clothes and telephoned several family members to tell them what he had done. After his brother called and confirmed that Walking Eagle was dead and that law enforcement had been notified, Boneshirt left his father's residence and started walking to his mother's residence.

Shortly thereafter, tribal police apprehended Boneshirt in a nearby field. After his arrest, Boneshirt reportedly said, "I did not do anything." The police then advised

him of his *Miranda* rights; Boneshirt requested to speak to his mother and with counsel but then stated, "I didn't do it. I was there, but I didn't do it." During a subsequent interview, however, Boneshirt described his altercation with Walking Eagle and confessed to killing her but insisted that he had not intended to kill her.

Boneshirt was initially charged as a juvenile offender with first-degree murder. He thereafter entered into a plea agreement with the government, agreeing to transfer his case to adult court and plead guilty to second-degree murder. The written plea agreement contained a waiver of defenses and appeal rights, which stated:

> The defendant hereby waives all defenses and his right to appeal any non-jurisdictional issues. The parties agree that excluded from this waiver is the Defendant's right to appeal any decision by the Court to depart upward pursuant to the sentencing guidelines as well as the length of his sentence for a determination of its substantive reasonableness should the Court impose an upward departure or an upward variance pursuant to 18 U.S.C. § 3553(a).

At the plea hearing, the district court engaged in a colloquy with Boneshirt about his guilty plea and his plea agreement. The court did not, however, address the waiver of appeal rights in the plea agreement. After the colloquy, the court accepted Boneshirt's guilty plea.

While awaiting sentencing, Boneshirt was incarcerated at the Hughes County Jail in Pierre, South Dakota. During this time, Boneshirt, by this time 18 years old, participated in a plan to escape from jail with fellow inmates Randy Little Shield and Robert Kelly.

The presentence investigation report (PSR) calculated a total offense level of 42. Because of Boneshirt's involvement in the plan to escape from jail, the PSR included a two-level enhancement for obstruction of justice, pursuant to U.S.S.G.

§ 3C1.1, and recommended against a three-level reduction for acceptance of responsibility, pursuant to § 3E1.1. The PSR also indicated that Boneshirt had several juvenile tribal-court convictions, including two previous incidents of aggravated assault. Because they were tribal convictions, however, the offenses did not result in any criminal history points. Thus, based on Boneshirt's criminal history category of I and his offense level of 42, the PSR recommended an advisory Guidelines range of 360 months' to life imprisonment.

In his sentencing memorandum, Boneshirt objected to the allegation that he had participated in a plan to escape from jail. He also objected to the PSR's denial of the reduction for acceptance of responsibility and application of the enhancement for obstruction of justice. In addition, Boneshirt argued that the court should impose a below-Guidelines sentence in light of the 18 U.S.C. § 3553(a) factors. Specifically, he argued for leniency based on his youth and intoxicated state at the time of the offense, his difficult childhood, and his alcohol-related neurodevelopmental disorder.

At the sentencing hearing, several witnesses testified about the alleged plan to escape from jail. On June 9, 2010, Boneshirt and four other inmates were detained in the work-release area of the jail. A jail official testified that he observed, on a surveillance camera, some of the inmates in the work-release area behaving suspiciously that night. Early the next morning, jail officials entered and searched the work-release area. The officials found a small metal "shank" in Little Shield's bunk, a cinder block under Little Shield's bunk, a hole in the suspended ceiling in the bathroom, and an L-shaped pipe above the bathroom ceiling. The officials conducted a brief pat-down search of all five inmates, including Boneshirt. They did not find any contraband on Boneshirt's person, his bunk, or any of his property.

Subsequently, the officers separately removed each inmate from the work-release area and interviewed them. Boneshirt denied any knowledge of or involvement in an escape plan. Once the work-release area was empty, officials conducted another

-4-

search and located an eight-inch metal shank in a toilet-paper dispenser in the bathroom.

Little Shield also testified about the escape plan. He acknowledged that he had state and federal criminal charges pending and that his testimony could adversely affect his sentencing. Nevertheless, Little Shield testified that he, Boneshirt, and two other inmates—Kelly and Robert Quiver—had discussed three different escape plans. One plan involved crawling through the ceiling, and another involved "tak[ing] out a correctional officer with a shank." Little Shield stated that Quiver had helped Boneshirt climb into the bathroom ceiling on a number of occasions and that Boneshirt had constructed a longer metal shank. After the pat-down search on the morning of June 10, 2010, Little Shield said that he, Boneshirt, and Kelly sat down at a table to play cards, and Boneshirt told the two of them not to snitch. At the time, Boneshirt was wearing a blanket over his shoulders; according to Little Shield, Boneshirt had previously used the blanket to move contraband around the work-release area without being observed on the surveillance camera. Little Shield testified that, after the pat-down search, Boneshirt stated that the guard did not find his metal shank, which, according to Little Shield, had been hidden between Boneshirt's legs. Little Shield testified that Boneshirt then took the shank to the bathroom, with the blanket over his shoulders, and placed the shank in the toilet-paper dispenser.

The government also introduced a surveillance video of the work-release area, which showed footage from the night of June 9 and the morning of June 10, 2010. The video showed that, after the officers conducted the pat-down search and left the work-release area, Boneshirt sat down at a table with Little Shield and Kelly to play cards. He later walked around the work-release area with a blanket over his shoulders and entered the bathroom, where the toilet-paper dispenser was located.

Following the testimony, the district court heard arguments from the government and Boneshirt about the appropriate Guidelines calculation and the

appropriate sentence. Boneshirt argued that the Guidelines produced an "extreme" increase in Boneshirt's penalty, based on the alleged escape plan. He argued that the evidence was insufficient to support applying an obstruction-of-justice enhancement, under U.S.S.G. § 3C1.1, and denying an acceptance-of-responsibility reduction, under § 3E1.1. In any case, Boneshirt argued that he deserved a lower sentence because he had fully confessed to killing Walking Eagle; showed genuine remorse when he confessed and apologized to his family members immediately after the killing; was mentally and emotionally still a child; and had endured a very difficult childhood, including an alcohol-related neurodevelopmental disorder caused by his mother's use of alcohol during pregnancy.

The district court first calculated the appropriate Guidelines range and overruled Boneshirt's objections to the PSR based on the escape plan. The court explained that "[t]here is no question there was some effort underway to get out of [jail]." Based on the fact that Boneshirt, Little Shield, and Kelly had sat down at a table together after the pat-down search, the court found that "[t]he evidence strongly indicates that the three of them were in cahoots." Further, because Boneshirt had walked into the bathroom with a blanket over his shoulders, the court found that it was likely that Boneshirt had concealed the eight-inch shank during the pat-down search and later discarded it in the toilet-paper dispenser. Although the court noted that Little Shield was "far from the most credible witness," the court found that the surveillance video and testimony from jail officials corroborated Little Shield's version of events. Thus, the court found that the evidence was "strong" and "certainly meets a preponderance of the evidence standard" to establish that Boneshirt had an "active role, if not the central role" in the plan to escape from jail. As a result, the court applied the two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, and rejected the two-level reduction for acceptance of responsibility, pursuant to § 3E1.1. Based on Boneshirt's total offense level of 42 and criminal history category of I, the court calculated a Guidelines range of 360 months' to life imprisonment.

-6-

The court then discussed, at great length, the appropriate sentence under 18 U.S.C. § 3553(a). First, the court observed that the nature and circumstances of the offense were "horrible," in light of the way Boneshirt had killed Walking Eagle, whom Boneshirt had described as a friend. Second, the court considered Boneshirt's history, including Boneshirt's "unfair" and "very troubled" childhood. The court acknowledged Boneshirt's neurodevelopmental disorder but noted that Boneshirt was surprisingly "coherent" in a letter to the court. Third, the court stated that Boneshirt's "rehabilitation needs are vast." Fourth, the court opined that there was a significant need to protect the public from Boneshirt's future crimes, especially in light of two of Boneshirt's prior offenses, one when he held a knife to a 15-year-old's throat and another when he brought a concealed weapon to school. Although the court explained that it would carefully consider Boneshirt's juvenile history, the court found that Boneshirt "does not have full control of his actions at times, and that quite obviously there is a very violent side to [him]." Finally, the court explained that it had considered "the kinds of sentences available, the sentencing range established by the sentencing commission's guidelines, pertinent policy statements made by the sentencing commission, and the need to avoid unwarranted sentencing disparities among similar defendants as well as the need for restitution."

In addition, the court acknowledged that its sentence would be more severe than the comparative sentences for murder that Boneshirt had presented at the hearing. The court noted, however, that Boneshirt's chart of sentences[2] had failed to account for at least one other case—involving two fatalities and a rape—that, in the court's view, was "even sadder than this one."

---

[2]Boneshirt presented data representing sentences for murder cases in the United States District Courts for the Districts of North and South Dakota, where the defendants, like Boneshirt, were represented by the Federal Public Defender. The court declined to receive the chart as evidence based on "a certain lack of foundation, lack of completeness."

Thereafter, the court sentenced Boneshirt to 576 months' imprisonment, followed by five years of supervised release. The court acknowledged that the sentence was very long but again explained that the sentence was "appropriate, given the nature of the offense, the nature of the post-offense conduct, and the need to protect society from Mr. Boneshirt." The court further explained that it "believe[d] that there is just too much of a risk with Mr. Boneshirt being a part of society before the point where he's of a very mature age."

## II. *Discussion*

On appeal, Boneshirt argues that the district court imposed a substantively unreasonable sentence. The government contends in opposition that Boneshirt waived his right to appeal the substantive reasonableness of his sentence in his written plea agreement.

## A. *Waiver of Right To Appeal*

The government argues that this court should dismiss Boneshirt's appeal because it is barred by the appellate rights waiver in his written plea agreement. The government contends that his appeal falls within the scope of the waiver, which only preserved his right to appeal "a traditional Guideline departure or an upward variance." Although it acknowledges that, at the plea hearing, the district court did not specifically ask Boneshirt about the waiver of his right to appeal, the government asserts that the record demonstrates that he knowingly and voluntarily entered into the plea agreement, citing *United States v. Michelsen*, 141 F.3d 867, 871–72 (8th Cir. 1998) (concluding that a dialogue about the appeal waiver was "not a prerequisite for a valid waiver of the right to appeal"), and *United States v. Cheney*, 571 F.3d 764, 767 (8th Cir. 2009) (enforcing an appeal waiver in a post-plea sentencing agreement despite the lack of a colloquy about the waiver). Finally, the government maintains that enforcing the waiver would not result in a miscarriage of justice.

Boneshirt contends that he may maintain his appeal despite the waiver because the district court failed to engage in the colloquy required by Federal Rule of Criminal Procedure 11(b)(1)(N). Under this court's precedent, Boneshirt maintains, the waiver of appellate rights cannot be enforced when the district court does not discuss the waiver with the defendant prior to accepting his plea. *See United States v. Laney*, 261 F. App'x 913, 913 (8th Cir. 2008) (unpublished per curiam); *United States v. Fugate*, 158 F. App'x 748, 749 (8th Cir. 2005) (unpublished per curiam); *United States v. Rojas-Coria*, 401 F.3d 871, 872 n.2 (8th Cir. 2005).

"Whether a valid waiver of appellate rights occurred is a question of law that we will review de novo." *United States v. Sisco*, 576 F.3d 791, 795 (8th Cir. 2009). "The government bears the burden of proving that the defendant's appeal is barred by the waiver." *United States v. Mink*, 476 F.3d 558, 562 (8th Cir. 2007).

Federal Rule of Criminal Procedure 11(b)(1)(N) requires that, "[b]efore the court accepts a plea of guilty or nolo contendere . . . the court must inform the defendant of, and determine that the defendant understands, . . . the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence." We have frequently declined to enforce an appeal waiver when the record does not establish that the district court engaged in the colloquy required by Rule 11(b)(1)(N). *E.g.*, *United States v. Slaughter*, 407 F. App'x 83, 83 (8th Cir. 2011) (unpublished per curiam) (declining to enforce an appeal waiver "given the minimal discussion of the plea agreement and waiver at the plea hearing"); *Fugate*, 158 F. App'x at 749 (declining to enforce an appeal waiver because the court did not engage in the required colloquy); *Rojas-Coria*, 401 F.3d at 872 n.2 (finding that the appeal was not barred by an appeal waiver where the court did not engage in the colloquy); *see also Laney*, 261 F. App'x at 913 (declining to address the enforceability of an appeal waiver—but considering the appeal nonetheless—when the transcript of the plea hearing was not part of the record on appeal).

We decline to enforce the appeal waiver in Boneshirt's plea agreement. The record indicates that the district court never discussed with Boneshirt the appeal waiver in the written plea agreement. At most, the court inquired whether Boneshirt understood that he could not withdraw his guilty plea if the court ultimately sentenced him to a longer sentence than he had expected. The court never mentioned his right to appeal or a waiver of that right; the government does not dispute this fact. Instead, it argues that our precedent in *Michelsen* and *Cheney* allows us to enforce the waiver. Those cases, however, are inapposite. As Boneshirt correctly notes, we decided *Michelsen* in 1998—*before* Rule 11(b) was amended to require courts to engage in a colloquy about the appeal waiver. *See* Fed. R. Crim. P. 11 advisory committee's note (1999 amend.). Likewise, our decision in *Cheney* explicitly noted that the colloquy requirement in Rule 11(b)(1)(N) was inapplicable in that case because, unlike the present case, the "sentencing agreement was reached after [the defendant's] plea hearing." 571 F.3d at 767 n.4. Therefore, the government has failed to prove that Boneshirt's appeal is barred by the waiver in his plea agreement.

## B. *Substantive Reasonableness*

Boneshirt argues that his "576 month (48 years) imprisonment sentence, is *substantively unreasonable* under the abuse-of-discretion standard considering the totality of the circumstances presented by [his] case." (Emphasis added.)

The government responds that the district court did not impose an unreasonable sentence and, therefore, did not abuse its discretion. The government argues that the court considered the § 3553(a) factors, focusing, in particular, on the need to protect the public from Boneshirt. The government also contends that the facts of this murder were "egregious," and, on that basis, the court could have imposed a longer sentence even in the absence of Boneshirt's involvement in the escape plan. Moreover, the government asserts that Boneshirt's criminal history justifies a longer sentence. The government notes that he has a history of committing violent crimes, and his involvement in the plan to escape (which entailed dangerous weapons and could have

resulted in harm to jail personnel) further demonstrates Boneshirt's violent propensities. Thus, the government maintains that the court was justified in believing that Boneshirt should be imprisoned until a "very mature age." Finally, the government argues that Boneshirt's comparative analysis of murder sentences is unhelpful because it failed to account for life sentences; in any case, the government contends that the district court considered the analysis and found that a 576-month sentence was warranted. Additionally, the government maintains that § 3553(a) does not mandate an "average" sentence, especially because the Guidelines ranges are already intended to account for average sentences. *See United States v. Mistretta*, 488 U.S. 361, 374–76 (1989).

This court applies "a deferential abuse-of-discretion standard" in reviewing the imposition of a sentence. *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (quotations and citations omitted). Generally, our first task is to "'ensure that the district court committed no significant procedural error.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). "'Procedural error' includes 'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.'" *Id.* (quoting *Gall*, 552 U.S. at 51).

> In the absence of procedural error below, we "should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, [552 U.S. at 51]. In conducting this review, we are to "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* If the defendant's sentence is within the Guidelines range, then we "may, but [are] not required to, apply a presumption of reasonableness." *Id.* But we are not permitted to apply a presumption of unreasonableness if the sentence is outside the Guidelines range. *Id.* Instead, we "may consider the extent of the deviation, but must give due deference to the district

court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id*. We *may not* require "'extraordinary' circumstances to justify a sentence outside the Guideline" and are prohibited from "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id*. at [47]. Just because we "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id*. at [51].

*Id*. at 461–62.

Here, Boneshirt alleges no form of *procedural error*. He did not challenge the district court's calculation of the Guidelines range—including the district court's application of the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 and denial of an acceptance-of-responsibility reduction under § 3E1.1—or consideration of the § 3553(a) factors. *See id.* at 461. "Because [Boneshirt] does not argue in his briefs that the district court committed any procedural error, we bypass the first part of our review and move directly to review the substantive reasonableness of his sentence." *United States v. O'Connor*, 567 F.3d 395, 397 (8th Cir. 2009) (footnote omitted). "[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." *Feemster*, 572 F.3d at 464 (quotation and citation omitted).

The district court calculated a Guidelines range of 360 months' imprisonment to life imprisonment based on Boneshirt's total offense level of 42 and criminal history category of I. On appeal, Boneshirt has not alleged that the district court procedurally erred in calculating the Guidelines range. *See Feemster*, 572 F.3d at 461. Under our precedent, "[a] sentence that falls within a properly-calculated advisory [G]uidelines range—as does [Boneshirt's] sentence—is presumptively reasonable on appeal." *United States v. Frausto*, 636 F.3d 992, 997 (8th Cir. 2011).

Boneshirt argues that his sentence is greater than necessary to meet federal sentencing goals under 18 U.S.C. § 3553(a) and, therefore, is substantively unreasonable. In doing so, Boneshirt notes that, absent the adjustments to his Guidelines range resulting from his jail escape attempt, his Guidelines range would have been 210 to 262 months' imprisonment—314 to 366 months less than the 576-month sentence actually imposed. Boneshirt compares this sentence with his probable sentence if he had simply been convicted of escape, in violation of 18 U.S.C. § 751(a). He asserts that he would have been subject to more than a statutory maximum sentence of five years' imprisonment. In other words, Boneshirt argues that the increase to his sentence under the Guidelines, based on the weak evidence of his involvement in the escape plan, was far greater than if he had simply been convicted of and sentenced for an actual escape offense. Boneshirt also contends that his sentence was 28.5 years longer than "the average murder sentence imposed by district courts in the Eighth Circuit." Again, he asserts that this disparity can only be attributed to the escape.

Boneshirt's argument suggests that applying the escape Guidelines over-emphasized the significance of his involvement in the escape plan—effectively punishing him more harshly than a conviction for the same offense. He contends that the district court should have declined to apply U.S.S.G. § 3C1.1. Additionally, he argues that a 576-month sentence overstates the seriousness of his offense because, as explained above, much of it is attributable to his "escape conspiracy conduct" and not the present offense.

Boneshirt's argument fails for two primary reasons. First, as previously noted, nowhere in his brief does Boneshirt argue that the district court *procedurally* erred in applying the obstruction-of-justice enhancement and in denying him an acceptance-of-responsibility reduction. Nor does he claim that the district court otherwise erroneously calculated his Guidelines range. *See Feemster*, 572 F.3d at 461. Second, Boneshirt's argument does not show that the district court abused its discretion in

using § 3C1.1. Boneshirt's argument is, in effect, an attack on the soundness of § 3C1.1 itself. We have recognized that, under the Supreme Court's decision in *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840, 843–44 (2009), a district court may reject a particular Guideline based on a policy disagreement with that Guideline. *United States v. Talamantes*, 620 F.3d 901, 902 (8th Cir. 2010) (per curiam). "But that does not mean that a district court *must* disagree with any sentencing guideline, whether it reflects a policy judgment of Congress or the Commission's characteristic empirical approach." *Id.* (quotations and citation omitted). This court's role, on appeal, is not to revisit those policy considerations; instead, we are limited to "determin[ing] whether the court abused its discretion by imposing a substantively unreasonable sentence on a particular offender." *Id.*

After a careful review of the sentencing record, we conclude that the district court did not abuse its discretion in sentencing Boneshirt to 576 months' imprisonment. Both the sentencing hearing transcript and the court's statement of reasons explaining its sentence demonstrate that the court considered all of Boneshirt's arguments and the § 3553(a) factors, ultimately imposing the sentence based on the "nature of the offense, the nature of post-offense conduct, and the need to protect society from Mr. Boneshirt." *Cf. United States v. Townsend*, 618 F.3d 915, 919 (8th Cir. 2010) (holding that defendant's 120 month sentence, although twice the mandatory minimum, was substantively reasonable, as the district court "specifically enumerated the § 3553(a) factors in its lengthy sentencing colloquy and discussed those factors, focusing primarily on [the defendant's] *substantial* criminal history and drug abuse").

Boneshirt's sentence may be longer than other sentences for the same crime, but that, by itself, does not establish that the district court abused its discretion. The record shows that the court considered Boneshirt's statistical evidence of sentences in similar cases but found them incomplete and unpersuasive. While § 3553(a)(6) requires courts to consider "the need to avoid *unwarranted* sentence disparities among defendants

with similar records who have been found guilty of similar conduct," (emphasis added), it does not prohibit a sentencing court from finding that a disparity is, in fact, "warranted." *See, e.g.*, *United States v. Vasquez*, 433 F.3d 666, 671 (8th Cir. 2006) (finding that a sentencing disparity between co-defendants was "not unwarranted" where one "was responsible for a larger quantity of drugs and had a greater criminal history" than the other). Here, the district court discounted Boneshirt's statistics. Boneshirt only provided statistics for similar *convictions*; his statistics do not account for whether the defendants had "similar *records*" or whether those offenses involved "similar *conduct*." 18 U.S.C. § 3553(a)(6) (emphases added). Indeed, the court found that the circumstances of Boneshirt's offense were particularly "horrible." Boneshirt's statistics also fail to account for the existence of any enhancements, which necessarily lengthen a given sentence. With these considerations, we cannot conclude that the longer sentence imposed for Boneshirt was "unwarranted."

Finally, Boneshirt has not argued that the district court *procedurally* erred by failing to consider the § 3553(a) factors. *See Feemster*, 572 F.3d at 461. Instead, in arguing that his sentence is *substantively unreasonable*, he maintains that his history and characteristics—including his juvenile status when he committed the offense, his substandard upbringing, and his neurodevelopmental disorder—warranted a lower sentence. But the record reflects that the district court "specifically enumerated the § 3553(a) factors in its lengthy sentencing colloquy and discussed those factors." *See Townsend*, 618 F.3d at 919. In calculating the Guidelines range, the district court observed that although "Mr. Boneshirt was—has been a juvenile" with "quite a juvenile history," such history under the Guidelines did not "count against him in terms of his criminal history category."

After calculating the Guidelines range, the court considered "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). As noted, it described Boneshirt's crime as "horrible" and found it "troubling . . . that Mr. Boneshirt would do that to someone he considers a friend

and someone that he was, according to his story, romantically involved with at that very moment." The court specifically considered "the history of the defendant," noting that it had "received and reviewed many records on Mr. Boneshirt's history" and stating, "Mr. Boneshirt, it is unfair how you were raised. You were troubled from a very early age. You are very young, 17 years old, now 18. *It is a factor that the Court considers*." (Emphasis added.) The court also considered Boneshirt's disadvantaged upbringing and his neurodevelopmental disorder but expressed doubt about how much that disorder affects Boneshirt based on his interactions with the court. The court reiterated its knowledge of "the details of the history of the defendant" and noted that it was "considering it all," including the "things [that] happened to Boneshirt that were completely out of his control as a child." Nevertheless, the court concluded that Boneshirt's life was one that "throughout has been largely out of control, both during the time when he didn't have much control over his life and during times *when he was of an age where he was beginning to make decisions for himself*." (Emphasis added.)

Next, the court considered the need to protect the public from Boneshirt's future crimes. *Id.* § 3553(a)(2)(C). On this note, the court explained that it was "careful" in considering "the juvenile history because it is a child, a person who is considered a child under law until age 18, a juvenile." Nevertheless, the court found that his prior assaults, combined with his involvement in the planned escape, demonstrated Boneshirt's propensity for committing violent crimes.

The court also stated, at the sentencing hearing and in its statement of reasons, that it had considered several of the other § 3553(a) factors. The record shows that the court considered all the appropriate factors, and nothing in the record demonstrates a clear error of judgment on the court's part in weighing those factors. Similarly, Boneshirt has not argued that the court considered any inappropriate factors.[3]

---

[3]We are mindful that sentencing courts may not consider the offender's rehabilitative needs in determining the length of the sentence to be imposed. *Tapia v. United States*, 131 S. Ct. 2382, 2388–91 (2011). The sentencing court may, however,

In sum, the record indicates that, over the course of a six-hour sentencing hearing, the district court thoroughly considered all of Boneshirt's arguments, the facts, and the law in attempting to fashion an appropriate sentence. The resulting sentence is harsh but is within the calculated Guidelines range and hence may be considered presumptively reasonable. *Frausto*, 636 F.3d at 997. Presumptively reasonable, however, does not mean unassailable. Yet this record is lacking in a demonstration of sentencing error on the part of the district court. Many reasonable minds may have imposed a lesser sentence, but we conclude that the district court did not abuse its discretion and impose an unreasonable sentence by selecting a high but within-Guidelines sentence for a homicide offense.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

---

consider the offender's rehabilitative needs when making other sentencing decisions, including "deciding whether to impose probation or supervised release." *Id.* at 2390. Although the district court briefly observed that Boneshirt's "rehabilitation needs are vast," it is unclear whether the court considered this fact with respect to the length of Boneshirt's sentence or some other component of his sentence. Regardless, Boneshirt has not argued that the district court abused its discretion by mentioning Boneshirt's rehabilitative needs. *See United States v. Frausto*, 636 F.3d 992, 997 (8th Cir. 2011) (finding that the appellant waived an issue by failing to make any supporting arguments on appeal).

BRIGHT, concurring in part and dissenting in part.

I concur with the majority that the appeal should not be barred by the waiver in Boneshirt's plea agreement. I strongly dissent as to the sentence.

Discretion in sentencing belongs with the district court, see United States v. Likens, 464 F.3d 823, 827 (8th Cir. 2006) (Bright, J., dissenting), but that discretion is not unfettered, United States v. Burns, 577 F.3d 887, 896-97 (8th Cir. 2009) (en banc) (Bright, J., concurring). As this court observes, "[a] sentence is substantively unreasonable if the district court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the appropriate factors but commits a clear error of judgment in weighing those factors." United States v. Lozoya, 623 F.3d 624, 626 (8th Cir. 2010) (quotation omitted). Stated another way, "'substantive review exists, in substantial part, to correct sentences that are based on unreasonable weighing decisions.'" United States v. Kane, 639 F.3d 1121, 1136 (8th Cir. 2011) (quoting United States v. Irey, 612 F.3d 1160, 1193–94 (11th Cir.2010) (en banc)).

In en banc this court has explained that it will be the "unusual" case when we reverse a sentence as substantively unreasonable. United States v. Feemster, 572 F.3d 455, 464 (8th Cir. 2009) (en banc). However, "[i]n sentencing, as in other areas, district judges at times make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur." Rita v. United States, 551 U.S. 338, 354 (2007). While we review the district court's sentencing decision for an abuse of discretion, "[t]here is a difference . . . between recognizing that another usually has the right of way and abandoning one's post." Kane, 639 F.3d at 1136 (quotation omitted).

Boneshirt's forty-eight-year sentence is substantively unreasonable because the district court unreasonably weighed the facts at issue in the case. The district court

failed to give proper weight to the fact that Boneshirt was a juvenile when he committed the crime, especially when his age is considered with his background and upbringing. And further, the district court's sentence placed too much weight on a plan to escape by Boneshirt when he was pending sentencing.

First, federal and state courts treat juvenile offenders, even serious offenders, differently than adults who commit serious crimes. Juveniles "have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" Graham v. Florida, 560 U.S. __, 130 S. Ct. 2011, 2026 (2010) (quoting Roper v. Simmons, 543 U.S. 551, 569–70 (2005)). The Supreme Court noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," Id., and "'[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" Id. (quoting Roper, 543 U.S. at 573). "[T]he character of a juvenile is 'more transitory' and 'less fixed' than that of an adult." Id. at 2038 (Roberts, C.J., concurring) (quoting Roper, 543 U.S. at 569–70). We still hold juvenile offenders responsible for their actions, but because of these fundamental differences a juvenile's offense "'is not as morally reprehensible as that of an adult.'" Id. at 2026 (quoting Thompson v. Oklahoma, 487 U.S. 815, 835 (1988) (plurality opinion)).

The heavy criminal sentence here does not recognize the possibility of rehabilitation for juveniles. Categorically, juveniles may not be sentenced to death, Roper, 543 U.S. at 578, and they may not be sentenced to life in prison without the possibility of parole for a nonhomicide crime, Graham, 130 S. Ct. at 2034. Part of the rationale in those cases is that "[j]uveniles are more capable of change than are adults" and "'[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character

deficiencies will be reformed.'" <u>Graham</u>, 130 S. Ct. at 2026–27 (quoting <u>Roper</u>, 543 U.S. at 570). "Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation." <u>Id.</u> at 2032. A sentence for a juvenile needs to take into consideration the transitory nature of youth and the possibility of rehabilitation.

Here the district court ignored these principles in sentencing Boneshirt, who was seventeen years old at the time of the crime, to forty-eight-years' imprisonment.[4] The district court calculated Boneshirt's total offense level at 42 and a criminal history category of I, thus indicating an advisory guideline sentence of 360 months (30 years) to life imprisonment. The sentencing judge justified, in part, his forty-eight-year sentence based on the crime being "horrible" and his belief that Boneshirt needed a lengthy incarceration to protect the public. Every murder is a horrible crime. Yet despite the already severe sentence included in the low end of the guideline range of 360 months (30 years), the sentencing judge proceeded to disregard statistics indicating much less harsh adult sentences for murder and hand down a sentence more than double the mean sentence for murder in the Eighth Circuit over the last five years.[5] While sentencing statistics are not determinative, they provide context for the

---

[4]By comparison, Graham was thirty-four days short of his eighteenth birthday when he committed the home-invasion robbery that lead to his sentence. <u>Graham</u>, 130 S. Ct. at 2019. As the Supreme Court noted, "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood," <u>Id.</u> at 2030 (quotation omitted).

[5]The mean sentence for murder in the Eighth Circuit over the past five years is just under 250 months (20 years, 10 months), as calculated from the statistics tracked by the United States Sentencing Commission.

| Fiscal Year | Mean (in months) | Number of Cases |
|---|---|---|
| 2010 | 285.3 | 10 |
| 2009 | 264.7 | 6 |
| 2008 | 150.2 | 5 |

-20-

gravity of the sentence imposed. And in imposing such a harsh sentence, the only consideration the district court gave to Boneshirt's age was to note: "You are very young, 17 years old, now 18. It is a factor that the Court considers."[6]

The district court put the proper sentencing for juveniles on its head in this case by not giving proper weight to Boneshirt's age and treating him much harsher than a similarly situated adult. Notwithstanding the broad sentencing discretion vested in federal judges, see Gall v. United States, 552 U.S. 38, 50–51 (2007), this sentence is wrong on its analysis of the facts and its application of sentencing requirements.

Second, the district court did not give proper weight to Boneshirt's background and upbringing. Like many children born and raised in Indian Country, Boneshirt suffered abuse beginning in infancy. See, e.g., United States v. Deegan, 605 F.3d 625, 639–42 (8th Cir. 2010) (Bright, J., dissenting). Boneshirt was born to an alcoholic mother and she and his step-father heaped physical and emotional abuse on this young

---

| 2007 | 247.2 | 9 |
| 2006 | 276 | 3 |

U.S. Sentencing Comm'n (USSC), Statistical Information Packet, Fiscal Year 2010, Eighth Circuit 10 (2010); USSC, Statistical Information Packet, Fiscal Year 2009, Eighth Circuit 10 (2009); USSC, Statistical Information Packet, Fiscal Year 2008, Eighth Circuit 10 (2008); USSC, Statistical Information Packet, Fiscal Year 2007, Eighth Circuit 10 (2007); USSC, Statistical Information Packet, Fiscal Year 2006, Eighth Circuit 10 (2006). I also note that the 2010 statistics were not available at the time of sentencing and, therefore, the mean would have been even lower. To reflect life expectancy, life sentences and sentences over 470 months are capped at 470 months. USSC, 2010 Sourcebook of Federal Sentencing Statistics 161 (2010). Murder includes first and second degree murder, felony with death resulting, and conspiracy to murder with death resulting. Id. at 165.

[6]The district court was also "careful when considering juvenile history and considering history from tribal court proceedings because of due process issues," but only in the context of discussing Boneshirt's previous criminal conduct as a juvenile.

boy. From ages three to seven, he was shifted out of his mother's home on numerous occasions and spent time with nine temporary foster families. His mental health situation was bad; he was born with alcohol-related neurodevelopmental disorder, and was diagnosed with a mood disorder and attention deficit hyperactivity disorder.

In an attachment to the PSR, Dr. Manlove gave an insight into Boneshirt's mental health, his alcoholism, and the relationship of these conditions to the crime. "It appears that the problems related to his Alcohol Related Neurodevelopmental Disorder, including mood swings and the impulsivity he had due to Attention Deficit Hyperactivity Disorder, were catalyzed by his intoxication resulting in the events leading to the death of Marquita Walking Eagle." Dr. Manlove also noted that "[a]ppropriate treatment for chemical dependency and psychiatric problems would certainly diminish the likelihood of future dangerous acts" and "Boneshirt's good behavior at the . . . Juvenile Services Center suggests that as he matures he may be more able to access and use the treatment process."

As a longtime federal judge, I have seen and reviewed scores of cases in which Indian males have been convicted of assaultive crimes, including murder. Alcohol has played a substantial role in the crime in almost every one of those cases. See, e.g., United States v. Jensen, 423 F.3d 851, 853 (8th Cir. 2005), United States v. LeClair, 338 F.3d 882, 884–85 (8th Cir. 2003), United States v. Emeron Taken Alive, 262 F.3d 711, 712 (8th Cir. 2001). And alcohol obviously played a major role in the unfortunate homicide of Ms. Walking Eagle.[7] Yet the sentencing judge chose a sentence well above the average sentence for murder when, in context, the circumstances were not outside of the usual, serious crime by an adult male Indian, particularly on a reservation.

_____

[7]It's quite a paradox. In the record in this case, alcohol flowed everywhere at the places Boneshirt and Ms. Walking Eagle visited and enjoyed. But they could not buy cigarettes at the convenience store on the reservation.

-22-

In addition, the district court did not take into consideration Boneshirt's life expectancy. The sentencing judge specifically expressed the desire to protect the public by ensuring that Boneshirt would be an old man when he was released: "the Court believes that there is just too much of a risk with Mr. Boneshirt being a part of society before the point where he's of a very mature age." However, the district court did not properly consider Boneshirt's background as a Native American male, who has a life expectancy of fifty-eight years. See Christopher J. L. Murray et al., Eight Americas: Investigating Mortality Disparities across Races, Counties, and Race-Counties in the United States, 3 PLoS Med. 1513, 1514 (2006) ("Native American males in the cluster of Bennet, Jackson, Mellette, Shannon, Todd, and Washabaugh Counties in South Dakota had a life expectancy of 58 [years] in 1997–2001 . . . .").[8] Even if he earns all of his good time credit, which the district court was not optimistic about, he will still serve more than forty years in prison. The district court anticipated Boneshirt would be an old man when he was released, but in reality he may be a dead man.

Finally, a significant event that increased the guideline range was an alleged plan for an escape from the Hughes County Jail. Without that finding, Boneshirt's guideline for sentencing would have been much less. Boneshirt would have received credit for acceptance of responsibility and no added points for obstruction of justice (the escape issue), resulting in an advisory guideline range of 210 months (17 years, 6 months) to 262 months (21 years, 10 months). His final sentence was more than twenty-six years over the maximum guidelines range without the escape attempt.

If Boneshirt had attempted to escape after sentencing, he would have been charged for attempted escape under 18 U.S.C. § 751(a), or instigating or assisting an escape under 18 U.S.C. § 752(b), and faced a statutory maximum sentence of five years. In this case, planning an escape attempt before sentencing added over twelve

[8]The offense occurred in Todd County, South Dakota.

years to Boneshirt's minimum guideline range. Such an increase in Boneshirt's sentence is substantively unreasonable for one poorly-timed, impetuous act of a teenager that, if attempted after sentencing, would carry a statutory maximum of five years. For a similar adult offender for second-degree murder in category I, even with obstruction of justice and no acceptance of responsibility, a thirty-year sentence should be an ample punishment. But adding eighteen years, in part for an escape conspiracy, which was unsuccessful and did no one any harm, seems clearly excessive.

In sum, in failing to give fair and adequate consideration to a juvenile's lack of judgment and the likelihood of change for the better of a youthful offender, especially in light of Boneshirt's upbringing, and in placing too much emphasis on a plan to escape, the district court was substantively unreasonable in weighing the facts and sentenced this defendant far more harshly than a comparable adult criminal. This excessive sentence should not stand regardless of the views of the majority. Thus, I dissent, and I would remand for reconsideration and possible reduction of the sentence.

_____