**UNITED STATES of America,**
Appellee,

v.

**Dana DEEGAN, Appellant.**

No. 08–2299.

United States Court of Appeals,
Eighth Circuit.

Sept. 17, 2010.

## ORDER

The petition for rehearing en banc is denied.

MURPHY, Circuit Judge, dissenting from denial of rehearing en banc.

I dissent from the denial of rehearing en banc. Following the Supreme Court's guidance in *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), and subsequent cases, our court has generally considered a procedurally correct guideline sentence to be reasonable. That deference is no doubt based in part on the fact that the United States Sentencing Commission has generally had a large database of previous offenses to consider in formulating guidelines. In this case Judge Bright has demonstrated that that may not have been true for the offense of neonaticide despite the assurances given to the district court before it imposed sentence. In my view this is an issue meriting en banc review.

The petition for rehearing by the panel is also denied.

BRIGHT, Circuit Judge, dissenting from denial of panel rehearing.

In the interest of justice, I dissent from the denial of the rehearing by the panel. This dissent focuses not on the length or

nature of the sentence, but whether it is supported by the facts, the law, and an understanding of the second-degree murder guidelines.

From the very beginning of this case, the prosecutor has never really comprehended the terrible abuse suffered by Ms. Deegan. The prosecutor mistakenly treated neonaticide as equivalent to an ordinary murder, and thus as a run-of-the-mine crime, falling within the sentencing guidelines. The serious error in this case occurred when the district court adopted the recommendation of the prosecutor and imposed a guideline sentence.

The result is a ten-year-plus sentence contrary to established principles and thus unreasonable. As this crime of neonaticide fell far outside the heartland, a sentence should not have been imposed under the second-degree murder guidelines. Imposition of this guideline sentence resulted in a sentence disparate with every other neonaticide case discussed in the record.[1]

I first refer to the prosecutor's contentions justifying the guideline sentence. In his response to the petition for rehearing, the prosecutor asserts these reasons, adopting and quoting in part from the majority opinion.

The prosecutor asserts that "[t]here is no clear record as to whether the Sentencing Commission considered 'neonaticide' to be a distinct phenomenon." Resp. to Pet. for Rehearing at 9. Clearly wrong!

The only neonaticide crime appearing in the Sentencing Commission record in the past four years since statistics have been kept electronically is that in the present case. *See United States v. Deegan*, 605 F.3d 625, 648 (8th Cir.2010) (Bright, J., dissenting).

This judge takes strong issue with the prosecutor's contention that the Guidelines applied to Ms. Deegan's crime. Thus I restate the operative words of the prosecutor at sentencing and the adoption of those recommendations by the district court which resulted in this unjust sentence:

> Prosecutor: The United States believes that the Sentencing Commission took into account ... these type[s] of crimes when it put together sentencing guidelines ... [A] guideline sentence would effectively meet the requirements of Section 3553....

Sent. Tr. 43.

> Prosecutor: [W]e think it's important that the defendant be sentenced in accordance with the sentencing guidelines.

*Id.* (Thus, the prosecutor recommended a guideline sentence, and nothing else.)

These are the crucial words of response by the District Judge: "I'm obligated to apply the guidelines...." *Id.* at 55.

> I have chosen in this case to impose a guideline sentence. I'm not going to exercise my discretion.... [The] sentencing guidelines ... ensure that sentences are consistent ... for people that commit this type of crime with the same type of criminal history that you have.

*Id.* at 59.

> I am agreeing with the Government's recommendation in this case and adhering to the guidelines....

*Id.* at 61.[2]

I hold the sentencing judge, my North Dakota colleague, in high regard. He is a

---

1. Deegan's counsel did not request a downward departure under the sentencing guidelines, but asked for a variance, which the district court interpreted as a request "for the imposition of a variance or a nonguideline sentence to be imposed in accordance with 18 U.S.C. Section 3553(a)." Sent. Tr. 55–56.

2. For background, I reproduce additional portions of the statements:

fine judge. Accepting the prosecutor's mistaken representation, the judge thought he was imposing a sentence which would be consistent with other crimes of neonaticide. But, in fact, the judge imposed an inconsistent sentence, one harsher by far than any other neonaticide case referred to in the record.

In the federal courts, ordinarily a ten-year-plus sentence for second-degree murder in a run-of-the-mine case would be reasonable. But here's the rub: the Guidelines do not apply to neonaticide because the Commission never contemplated that crime in promulgating the Guidelines; such crimes were never run-of-the mine federal crimes. The cases considered in the Guidelines by the Sentencing Commission in no way related to a woman who just delivered her baby under the most stressful conditions. Unfortunately, the sentencing judge meant well but was mistaken. Any judge can make a mistake. I urge this court to afford the sentencing judge the opportunity to correct this grievous error by vacating and remanding for resentencing. In light of the circumstances of this case, what's wrong with that solution?

This dissent now turns to the prosecutor's comments regarding the crime of neonaticide as justification for the ten-year-plus sentence imposed on Ms. Deegan:

> But, the inflicted death of an innocent child, whether on the reservation as part of a long and continuing history of tragedy, or elsewhere, cannot be ignored or diminished by any number of mitigating circumstances.

Resp. to Pet. for Rehearing at 7.

Section 3553(a)(2)(A) states that one sentencing factor is the "seriousness of the offense ... and [the need] to provide just punishment...." And indeed, the taking of an innocent life is a serious matter calling for a proper sentence under the law. But an innocent life is taken in every neonaticide case, and yet Ms. Deegan's sentence is many times harsher than any other sentence referred to in the record. Moreover, the seriousness of the offense and need for just punishment is but one sentencing factor. The district court did not consider the other sentencing factors.

Further remarks by the prosecutor regarding § 3553(a) are also cause for great concern. The prosecutor states:

> [T]he [district] court may even have concluded that the case was outside the heartland, and that it was proper to

---

Prosecutor: "The United States believes that the Sentencing Commission took into account these type of events, these type of crimes when it put together sentencing guidelines such as exist in the 1997 edition. Given that fact, Your Honor, we believe that a guideline sentence would effectively meet the requirements of Section 3553, all of those goals of sentencing." Sent. Tr. 43.

Prosecutor: "[W]e think it's important that the defendant be sentenced in accordance with the sentencing guidelines." *Id.*

District Judge: "I'm obligated to apply the guidelines that were in effect at the time that this incident occurred in October of 1998, rather than the present sentencing guidelines in effect today." *Id.* at 55. "I have chosen in this case to impose a guideline sentence. I'm not going to exercise my discretion and depart and impose a nonguideline sentence because I believe that the sentence range that's been provided for in the sentencing guidelines in this particular case is reasonable, and I'll try to explain why." *Id.* at 59.

"We have sentencing guidelines in the federal system that are designed to ensure that sentences are consistent and uniform throughout the country for people that commit this type of crime with the same type of criminal history that you have." *Id.* at 59. "I am agreeing with the Government's recommendation in this case and adhering to the guidelines because I believe that they are reasonable." *Id.* at 61.

consider departure under § 5K2.0, if not variance.

*Id.* at 8.

[T]he court concluded a (low end) [guideline] sentence was reasonable and within the parameters of § 3553.

*Id.* at 5.

" '[T]he district court simply treated the advisory guideline range as an initial starting point, while determining the final sentence after consideration of all of the § 3553(a) factors taken as a whole. . . . There is no showing that an erroneous assumption about the underlying basis for the second-degree murder guideline drove the determination of Deegan's sentence.' "

*Id.* at 5–6 (quoting *Deegan*, 605 F.3d at 633).

These assertions present a completely false picture of the actual words and statements of the prosecutor and the judge at the sentencing hearing. As I have previously demonstrated, the sentence imposed started and ended as a guideline sentence and nothing else. Yes, the judge stated his awareness of the § 3553(a) factors but never, I repeat, never applied them. *See Deegan*, 605 F.3d at 652–53 (Bright, J., dissenting).

Therefore, I restate and review the additional § 3553(a) factors [3] that should have controlled and applied here. They, however, played no actual role in Ms. Deegan's sentence.

As opposed to the district court's silence, Dr. Resnick applied the § 3553(a) factors to the crime of neonaticide generally and to Ms. Deegan. Dr. Resnick addressed the usual case of neonaticide, that of a teenager unable to deal with the disappointment in her mother's eyes when she learns that her child engaged in premarital sex. Dr. Resnick explained that these young women endure great anguish, delivering the baby without anesthesia or assistance, and stifling screams in order to hide the birth from their parents. Often the mothers hide the infants' bodies or may drop them in a dumpster. These crimes of neonaticide arise from desperation.

Ms. Deegan's crime arose out of great desperation. In comparison to that of the teenagers, Dr. Resnick said, "[hers] was an impulsive act." Sent. Tr. 29. He further explained:

[T]he evidence for that [impulse] includes the fact that in many of the women I've seen who do commit neonaticide, they will take pains to take the baby far

---

**3.** The court "shall impose a sentence sufficient, but not greater than necessary" and "shall consider" the following factors:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed—

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medi-

cal care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established for—

      (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

    . . . .

    (5) any pertinent policy statement—

    . . . .

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

away and bury the baby or drop a baby in a dumpster.

And in Ms. Deegan's case, the way she carried it out of just leaving the baby where it might have been discovered and she would be caught, and then when she eventually disposed of the baby after she returned, she put the baby 50 yards from her own house, so that's not the kind of conduct you expect in someone who is planning to take a baby's life and get away with it.

*Id.*

Let me be clear: every neonaticide case in Dr. Resnick's experience occurred under state, not federal, law. But it is not important where the cases arose because Dr. Resnick analyzed these sentences in light of the § 3553(a) factors. He concluded that those factors did not call for a lengthy prison sentence for the following reasons:

    a. A prison sentence is not necessary to protect others. Add. 2, p. 24 (Resnick Report).

    b. The offenders pose a low risk of recidivism. Sent. Tr. 31.

    c. Many women are rehabilitated and become good mothers. *Id.* at 32.

    d. A lengthy sentence will not deter others. *Id.* at 32–33.

    e. Mental factors that may lead to the commission of neonaticide include severe depression and dissociation. *Id.* at 35.

Dr. Resnick reported that in the cases where women pleaded guilty, the sentence seldom exceeded three years' incarceration. Add. 2, p. 24 (Resnick Report). Indeed, Dr. Resnick concluded that a sentence under the federal guidelines would

create an unwarranted disparity. *Id.* My own research revealed only one federal case of neonaticide, in which a teenage American Indian received 44 months' probation while her boyfriend who assisted her received 70 months' imprisonment. *See United States v. Tom,* 494 F.3d 1277 (10th Cir.2007), *rev'd and remanded to* 327 Fed.Appx. 93 (10th Cir.2009).

Dr. Resnick's discussion of teenager neonaticide, when viewed through the lens of 18 U.S.C. § 3553(a), makes clear that Ms. Deegan deserved equal treatment with these women; after all, Ms. Deegan landed in federal court only because she is an Indian living on a reservation. A difference in jurisdiction should not justify her harsh and disparate sentence. Moreover, the similar equal and fair treatment of every neonaticide case as related by Dr. Resnick negates the prosecutor's statement that mitigation should not apply here when mitigation applied to every other situation.

Yet one more significant case illustrates the unfair and unequal treatment Ms. Deegan received in comparison to other similar offenders. We know that a college student in North Dakota committed a neonaticide which is described in the record as "very similar [to the] kinds of situations here." Sent. Tr. 51. We can, in light of the record, assume that this college student in the State of North Dakota represented a typical neonaticide crime such as those described by Dr. Resnick.[4] The sentence of three years' probation imposed on the college student is consistent with the fair sentences in neonaticide cases described and analyzed by Dr. Resnick under the rubric of § 3553(a). Given this case and the others described by Dr. Resnick,

---

4. The record of this college student's case is in the District Court of Cass County, North Dakota. Given the importance of Ms. Deegan's case and the disparity in the sentences

between Ms. Deegan and the college student, some interested individual will examine that case and compare the circumstances of these two cases of neonaticide in North Dakota.

how can Ms. Deegan's sentence be considered fair and just?

This case is not over. Several important issues may call for United States Supreme Court review. The application of the guideline sentence to the crime of neonaticide, a crime completely outside the heartland of the second-degree murder guidelines, seems to conflict with the Supreme Court's decision in *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). *Koon* held that a district court may depart from a guideline sentence when a defendant's case is atypical. *Id.* at 94, 116 S.Ct. 2035.

True, *Koon* arose during the era of mandatory guideline sentencing and *Koon* concerned a departure, not a variance. Yet the principle that a court can and should impose a non-guideline sentence in an atypical case still applies today. The district court, wedded to the Guidelines, ignored the principle of *Koon* and imposed a guideline sentence even though Ms. Deegan's case differed from other second-degree murder cases to which the guideline did apply. And it has not been shown that the Sentencing Commission included neonaticide cases when it promulgated the guideline in question here.

Another important issue in this case may call for Supreme Court review. Since *Gall* and *Rita,* many cases in this circuit seem to have adopted the rule that this court should affirm a guideline sentence, regardless of circumstances calling for a lower sentence, so long as the sentencing judge utters these magic words: "I have considered § 3553(a)." Frequently, no reasons are given for the sentence, or the reason, if given, lacks any substance. *See United States v. Woods,* 603 F.3d 1037, 1039 (8th Cir.2010); *United States v. Jordan,* 573 F.3d 586, 590 (8th Cir.2009); *United States v. Clay,* 524 F.3d 877, 878 (8th Cir.2008). Such a misreading of *Gall*

and *Rita,* if not corrected, can preclude effective appellate oversight, as well as return sentencing to de facto mandatory guideline sentences. This approach is so evident in this case where the district court assumed the Guidelines applied—when they did not—and where the majority and prosecutor, without support, now claim that the district court applied the § 3553(a) factors.

Additionally, the application of the second-degree murder guidelines and lack of attention to § 3553(a), disregarded Ms. Deegan's extraordinary rehabilitation prior to sentencing. That Ms. Deegan turned her life around, had a good employment record, separated herself from her abusive partner, and become a great mother meant nothing when the court imposed a guideline sentence. The importance of rehabilitation in the sentencing process is an issue now before the Supreme Court. *See United States v. Pepper,* 570 F.3d 958 (8th Cir.2009), *cert. granted* —— U.S. ——, 130 S.Ct. 3499, 177 L.Ed.2d 1089 (2010). The *Deegan* case, in greater depth and extent, raises the important question of whether rehabilitation should or did apply at sentencing. The record shows that the rehabilitation of Ms. Deegan could play no actual role in her sentence when the district judge automatically imposed the guideline sentence. *See Deegan,* 605 F.3d at 649 (Bright, J., dissenting).

The ten-year, harsh sentence focused only on one factor: the death of a child. This case, along with *Pepper,* would serve the important function of bringing before the Supreme Court the entire spectrum of rehabilitation and its importance in the federal sentencing process.

This case is more than just a sentencing case. The record and the sentence show a disregard of the special and unique situation of women who commit neonaticide. In every other case described by Dr. Res-

nick in the record, these women received compassion and understanding in their sentences. In Ms. Deegan's case, her second-degree murder case was treated no differently than if a man had committed the crime. But Ms. Deegan is not like a man; she is an Indian woman who had just delivered a baby, while suffering from a Major Depressive Disorder, Posttraumatic Stress Disorder, and Dysthymic Disorder, after a life of severe degradation. *See* Add. 2, p. 13 (Resnick Report).

Ms. Deegan's sister made an appropriate but not quite complete observation, "I fear that these same cultural factors may also contribute to harsher penalties of an already oppressed woman." *Deegan,* 605 F.3d at 657. This record certainly raises the further question whether the persons in the sentencing process, probation officer, prosecutor, and sentencing judge (all male), really comprehended what Ms. Deegan was going through at the time of the neonaticide. The record answers "no."

I believe the importance of this case to American Indian communities, the uniqueness of this case in the federal courts, the manifest mistakes in imposing the sentence, and the lurking matter of unequal justice, call out for possible review by the United States Supreme Court.

A new matter has now arisen for consideration. On July 29, 2010, President Obama signed into law the Tribal Law and Order Act of 2010, Pub. L. No. 111–211, 124 Stat. 2258. Authored by Senator Byron Dorgan of North Dakota, this legislation gives special recognition and attention to the sexual abuse and violent crime against women and children on Indian reservations that has gone largely unaddressed for years. The Act aims to curb precisely the sort of abuse that Ms. Deegan suffered most of her life and affords special protection to American Indian women and children who too long have suffered intolerable sexual and physical abuse on Indian reservations.[5]

The passage of this legislation should require a fresh look at the methodology and reasoning undergirding the harsh sentence imposed on Ms. Deegan. The new enactment by Congress and the recognition that protection of American Indian women and children requires action by the federal government rebuts the prosecutor's continued assertions that the abuse suffered by Ms. Deegan, which led her to take the life of her own child out of desperation, should play no role in the imposition of her sentence. Ignoring the background for this new law and continuing to insist, in essence, that Ms. Deegan got what she deserved, is a monstrous position in the face of this national recognition of the high level of abuse of women and children on Indian reservations. The prosecutor fails to recognize that Ms. Deegan is a victim along with her deceased child. The excessive sentence in this case only serves to further victimize her and her children.

I address the following to the executive and judicial branches of our government. There exists now a new era under law relating to the protection of American Indian women and children who, like Ms. Deegan, have suffered great pain from long-ignored abuse on the reservations. It seems inconsistent with our mission under the new Act to approve the harsh sentence imposed on Ms. Deegan, a victim of the very atrocities which the legislation seeks to address.

Considering our responsibilities to the American Indian communities, what sort of beginning is it to approve this harsh sentence upon an American Indian woman

---

**5.** This writer has called attention to these conditions in the appendix to the dissent.

*Deegan,* at 605 F.3d at 662–65 (Bright, J., dissenting).

who has suffered so much? In the face of such disparate treatment, how can we expect the respect and cooperation the federal government will need from the Indian communities to carry out its legislative mission? Each person involved in this case has the awesome responsibility and the power to right a great wrong.