United States Court of Appeals

For the Eighth Circuit

_____

No. 15-1738

_____

United States of America

*Plaintiff - Appellee*

v.

Gordon Lasley, Jr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: December 18, 2015
Filed: August 12, 2016

_____

Before WOLLMAN, BRIGHT, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

After a lengthy trial, a jury convicted Gordon Lasley, Jr., of the second-degree murder of his parents in Indian country. See 18 U.S.C. §§ 1111, 1153. The district court[1] imposed two consecutive life sentences, the top of Lasley's advisory guidelines

_____

[1]The Honorable Linda R. Reade, Chief Judge of the United States District Court for the Northern District of Iowa.

sentencing range. Lasley appeals his conviction and sentence, arguing the court erred by refusing to instruct on the lesser-included offense of involuntary manslaughter, and by imposing a substantively unreasonable sentence. We affirm.

## I. Background

The facts relevant to the issues on appeal are undisputed. At the time of the murders, Lasley was twenty-five years old, living in the basement of his parents' home in the Iowa Meskwaki Settlement. His girlfriend, Antonia, and their three children lived apart from Lasley, but all five gathered at the parents' home on the evening of February 5, 2014. Antonia and Lasley smoked marijuana in the basement; Lasley's parents remained upstairs. Around 8:30 p.m., Antonia left with two of the children, leaving one daughter behind. Antonia testified that, when she left, Lasley seemed "happy" and "was listening to pow-wow music and dancing."

At some point during the next hour, Lasley went upstairs and killed his parents, using a three-foot-long machete. He first killed his father by striking him three times with the machete, inflicting major wounds. Crime scene evidence indicated his father struggled and tried to flee. Lasley then turned on his mother, who saw him kill his father. Lasley chased her through the house, striking her with the machete at least six times in the head, neck, and chest. Both parents bled to death. In the next hour, Lasley had several rambling phone conversations with Antonia, saying, among other things: "Are you afraid to die?"; "Just go to the light"; "I killed my mom and dad"; "We're free. We're saved"; and "My mom and dad raised me wrong. The white man's religion is wrong." He also said he told his parents there were sexually transmitted diseases on the settlement, and his father responded, "it was right here." Lasley then drove to his brother's home and told him, "I'm sorry. I'm sorry. . . . I killed mom and dad."

Lasley was tried on two counts of first-degree murder. His primary defense was not guilty by reason of insanity. Two defense experts offered different theories of insanity. One testified that Lasley suffered from paranoid schizophrenia, distorting his perception of reality. The other testified that Lasley's insanity stemmed from a delusional disorder and a psychotic episode on the night of the murders; he opined that Lasley was under the delusion that his parents had put "bad medicine" on him, causing him to have a sexually transmitted disease, and the only way to remove the bad medicine was to kill his parents. In rebuttal, a government expert testified that Lasley was sane at the time of the murders and that his belief in bad medicine was a shared cultural belief, not a delusion. The government also called lay witnesses who testified to Native American culture and Lasley's mental health.

## II. The Jury Instruction Issue

Prior to trial, Lasley submitted proposed jury instructions on the lesser-included offense of involuntary manslaughter. At the close of the evidence, after an off-the-record discussion with counsel, the court declined to give involuntary manslaughter instructions. During closing argument, defense counsel reviewed the conflicting expert testimony in detail and urged the jury to find Lasley not guilty by reason of insanity of all first and second degree murder charges. The jury rejected the insanity defense, found Lasley guilty of the second-degree murder of both parents, and acquitted him of first-degree murder.

On appeal, Lasley argues the district court erred in refusing to instruct the jury on the offense of involuntary manslaughter. Involuntary manslaughter is a lesser-included offense of murder. United States v. One Star, 979 F.2d 1319, 1321 (8th Cir. 1992). A defendant is entitled to a properly requested lesser-included offense instruction "if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Keeble v. United States, 412 U.S. 205, 208 (1973). We review the district court's decision not to instruct on involuntary

manslaughter for abuse of discretion.  See United States v. Martin, 777 F.3d 984, 997 (8th Cir.), cert. denied, 135 S. Ct. 1882 (2015).

Involuntary manslaughter is "the unlawful killing of a human being without malice . . . [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."  18 U.S.C. § 1112(a).  When Lasley repeatedly slashed his parents with a three-foot-long machete, he committed the felony of assault with a dangerous weapon.  See 18 U.S.C. § 113(a)(3).  He made no claim that he accidentally stabbed his parents.  On this evidentiary record, a rational jury could not have acquitted Lasley of first- and second-degree murder and convicted him of involuntary manslaughter.  See United States v. Elk, 658 F.2d 644, 649-50 (8th Cir. 1981); United States v. Lincoln, 630 F.2d 1313, 1320 (8th Cir. 1980); United States v. Wallette, 580 F.2d 335, 338-39 (8th Cir. 1978).

"The requisite mental state for involuntary manslaughter is 'gross' or 'criminal' negligence . . . short of the extreme recklessness, or malice required for murder."  One Star, 979 F.2d at 1321.  Lasley argues the jury could have found that he acted without the malice aforethought that is an element of murder, see 18 U.S.C. § 1111(a), because, while not legally insane, "he suffered from a significant mental impairment at the time of the killings."  He cites no supporting authority for this theory, and it is unsound as a matter of law.  The Insanity Defense Reform Act of 1984, codified at 18 U.S.C. § 17(a), provides that insanity is an affirmative defense to any federal prosecution, but "[m]ental disease or defect does not otherwise constitute a defense." This statute as uniformly construed precludes a diminished capacity defense to general intent crimes such as second-degree murder and voluntary manslaughter.  See United States v. Frank, 472 F. App'x 431, 432 (9th Cir. 2012); United States v. Pohlot, 827 F.2d 889, 907 (3d Cir. 1987), cert. denied, 484 U.S. 1011 (1988); see generally Clark v. Arizona, 548 U.S. 735 (2006).  Thus, the district court did not abuse its discretion in refusing to instruct the jury on involuntary manslaughter.

## III. The Sentencing Issue

At sentencing, the district court determined that Lasley's advisory guidelines sentencing range was 360 months to life in prison. After considering the 18 U.S.C. § 3553(a) sentencing factors, the court determined that consecutive life sentences for each murder was "sufficient but not greater than necessary to achieve the goals of sentencing." Lasley argues the court imposed a substantively unreasonable sentence. We review the substantive reasonableness of a sentence under a deferential abuse-of-discretion standard. United States v. Boneshirt, 662 F.3d 509, 517 (8th Cir. 2011), cert. denied, 132 S. Ct. 1613 (2012).

The district court articulated many reasons for imposing a life sentence. First, the court noted that a life sentence was within the guidelines range had Lasley murdered one parent. But he murdered both parents, and the court found, by a preponderance of the evidence, that the killings were premeditated murder. Second, the court explained that Lasley "brutally murdered" his fleeing parents in view of his young daughter, and there was "no evidence of any provocation that would cause a reasonable person to murder these parents." Third, consistent with past decisions, the court viewed Lasley's criminal history -- twenty-six convictions by age twenty-six -- as evidence of his disrespect for authority. See United States v. Walking Eagle, 553 F.3d 654, 657-58 (8th Cir. 2009). Fourth, the court concluded that Lasley "poses a substantial risk to the public safety" given his anger and past violence, which included assault convictions, repeated abuse of his girlfriend, and the slaying of his parents. The court explicitly considered mitigating factors -- Lasley's mental health, substance abuse, employment, and family life -- as well as the need to avoid unwarranted sentencing disparity. After weighing these factors, the court determined that a life sentence was appropriate.

On appeal, Lasley argues the sentence is substantively unreasonable because "it was heavily based on a finding of premeditation and deliberation that was rejected

-5-

by the jury and not sufficiently established one way or the other to justify the weight accorded it." Because a jury's acquittal establishes only that the government failed to prove an essential element of an offense beyond a reasonable doubt, it is well settled that "a sentencing court may consider the conduct underlying an acquitted charge so long as that conduct has been proved by a preponderance of the evidence." Martin, 777 F.3d at 997 (quotation omitted); see United States v. Watts, 519 U.S. 148, 157 (1997); United States v. Stroud, 673 F.3d 854, 862-63 (8th Cir. 2012), cert. denied, 133 S. Ct. 1581 (2013). Here, Lasley argues the evidence "simply did not preponderate . . . on the issue of premeditation." The district court disagreed:

> Perhaps there's an argument that the murder of Gordon Lasley Sr. was not premeditated, but when you think of the trial evidence and the way he was attacked from behind and the number of blows and the evidence suggests that he was trying to escape . . . to the front door, I think Murder in the First Degree was established by the evidence. Not found by the jury, but established by a preponderance of the evidence in my mind.

> Clearly, the murder of Kim Lasley was premeditated. She watched the defendant attack her husband with the machete. She saw him collapse, and as he bled to death . . . the defendant turned on her, and the defendant even remarked after the incident that his mother just stood there and she didn't do anything; she didn't call the police. Rather, she ran down the stairs, was likely attacked on the stairs, and there is indication that she was struggling, hoping to get out the basement door.

Having reviewed the trial record, we conclude that these findings of premeditated murder were not clearly erroneous.

Lasley further argues that it was substantively unreasonable "to impose a sentence substantially based on" the district court's disagreement with the jury's first-degree murder verdict. That argument overstates the legal effect of an acquittal. But

in any event, the district court identified numerous factors that together justified a life sentence, and we have repeatedly held that a "district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." United States v. Maxwell, 664 F.3d 240, 247 (8th Cir. 2011) (quotation omitted). Moreover, a life sentence on each count was within the advisory guidelines range and is therefore presumptively reasonable on appeal. See Boneshirt, 662 F.3d at 517.

It is "the unusual case when we reverse a district court sentence -- whether within, above, or below the applicable Guidelines range -- as substantively unreasonable." United States v. Feemster, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) (quotation omitted). Given the district court's thorough consideration of the § 3553(a) factors, we conclude the court did not abuse its substantial sentencing discretion in imposing an admittedly harsh within-guidelines sentence. See Boneshirt, 662 F.3d at 520.

The judgement of the district court is affirmed.

BRIGHT, Circuit Judge, dissenting.

I dissent.[2]

I write to protest the sentencing disparity in this case and the heavy disparity in sentences for other similarly-situated individuals based purely on their race and residence.[3] Appellant-defendant Gordon Lasley (Lasley), an Indian[4] and twenty-six-

---

[2]I concur with the majority as to the jury instruction issue.

[3]While I recognize existing precedent supports the majority opinion, it is well established that "when governing decisions are unworkable or are badly reasoned," the law can, and must, change. Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct.

years old at the time of sentencing, will spend the rest of his life in prison for a conviction of two counts of <u>second</u>-degree murder, but a sentence imposed as though the conviction was for two counts of <u>first</u>-degree murder. This result comes about because our precedent: (1) purports to allow the imposition of the federal sentencing regime to cases under the Major Crimes Act, 18 U.S.C. § 1153 <u>without</u> consideration of sentences imposed and actual time served for similar state-law crimes; and (2) authorizes federal district courts to find a defendant committed a greater offense for the purpose of sentencing when a jury expressly convicts a defendant of the lesser-included offense. The consequence of both precedents is a high probability Lasley will serve a longer sentence than a white citizen because Lasley is an Indian who committed a crime in Indian Country. This disparity resting on Lasley's status as an Indian is unjust, unfair, and improper for the reasons set forth herein. Thus, Lasley's sentence should be reversed and remanded.

## I.

The first legal infirmity presented in this case relates to the application of the U.S. Sentencing Guidelines (Guidelines) to cases brought under the Major Crimes Act without consideration of sentences and time served for similar state-law crimes. The federal courts' method of sentencing individuals under the Major Crimes Act creates documented disparities in sentences and, as such, Indians often receive higher sentences purely because of their status as an Indian in Indian Country. Such

---

2597, 115 L. Ed. 2d 720 (1991). Here, precedent from this Court permits a federal district court to impose an unfair sentence and, therefore, the law must change.

[4]While imprecise to describe Native Americans and their reservation lands, I use the terms "Indian" and "Indian Country" because both are legal terms of art that appear in the Major Crimes Act, 18 U.S.C. § 1153. <u>See</u> Tribal Issues Advisory Group, Report 4, 16-17 (2016) [hereinafter TIAG Report] (citing <u>United States v. Stymiest</u>, 581 F.3d 759, 762-64 (8th Cir. 2009)), <u>available at</u> http://www.ussc.gov/research/research-publications/report-tribal-issues-advisory-group.

disparities are analogous to disparities in equal rights for African Americans before and since Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). In light of documented disparities, like the legal shift after Brown, the law regarding the sentencing of individuals under the Major Crimes Act and the Guidelines must change to avoid harsh computation of punishments based purely on an individual's status as an Indian in Indian Country.

## A.  The Major Crimes Act and Applications of the Guidelines

The Major Crimes Act creates federal jurisdiction over certain enumerated crimes,[5] including murder, committed by Indians in Indian Country. Kills Crow v. United States, 451 F.2d 323, 324 (8th Cir. 1971). Jurisdiction over the types of crimes enumerated in the Major Crimes Act would generally lie with the state or tribal governments. Native American Advisory Group, Report 1 (2003) [hereinafter NAAG Report], available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20031104_Native_American_Advisory_Group_Report.pdf. Congress enacted the Major Crimes Act "to insure equal treatment for Indian and non-Indian offenders who commit certain offenses in Indian country." United States v. Norquay, 905 F.2d 1157, 1163 (8th Cir. 1990) (emphasis added) (quoting H.R. Rep. No. 94-1038 (1976), reprinted in 1976 U.S.C.C.A.N. 1125).

In 1990, Congress also applied the Guidelines to the Major Crimes Act. Crime Control Act of 1990, Pub. L. No. 101-647, § 1602, 104 Stat. 4789 (1990). Prior to that time, some "federal judges tried to take into account Indians' different culture

---

[5]The enumerated crimes are "murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country." 18 U.S.C. § 1153(a).

and the distinct societal background presented by the tribes" when imposing sentences under the Major Crimes Act. Jon M. Sands, <u>Departure Reform and Indian Crimes: Reading the Commission's Staff Paper with Reservations</u>, 9 Fed. Sent'g Rep. 144, 144 (1996). By applying the Guidelines to Major Crimes Act cases, Congress directed district courts to sentence individuals purely under the Guidelines even when the crime was one traditionally prosecuted under state or tribal law. Documented sentencing disparities for Indians committing crimes in Indian Country are the consequence of Congress' directions relating to the application of the Guidelines to the Major Crimes Act.

## B.    Disparities Created by Application of the Guidelines

Concerns surrounding Congress' decision to apply the Guidelines to the Major Crimes Act are not new. Prior to the application of the Guidelines, many articulated concern that Indian defendants would be treated more harshly under the Guidelines than individuals prosecuted for similar offenses in their respective states. See Tribal Issues Advisory Group, Report 17 & n.16 (2016) [hereinafter TIAG Report] (citing Tova Indriz, Testimony before U.S. Sentencing Comm'n (Nov. 5, 1986); Letter from Frederic F. Kay, Fed. Pub. Def., Dist. of Ariz., to Hon. William W. Wilkins, Chair, U.S. Sentencing Comm'n (Aug. 9, 1989)), <u>available at</u> http://www.ussc.gov/ research/ research-publications/report-tribal-issues-advisory-group.

Unfortunately, Congress ignored the concerns regarding the likelihood of disparity.[6] As a consequence, Indian defendants, like Lasley, prosecuted under the Major Crimes Act often receive much harsher sentences and serve longer terms of

---

[6]At the time the Guidelines were adopted, the only special consideration given to Indians concerned the treatment of prior tribal court convictions. TIAG Report at 17 n.16. Specifically, U.S. Sentencing Guidelines Manual § 4A1.2(i) provides that "[s]entences resulting from tribal court convictions are not counted, but may be considered . . . [for] [a]dequacy of [c]riminal [h]istory."

imprisonment than individuals convicted of similar state-law crimes. Information regarding this sentencing disparity can be gleaned from a number of sources.

First, judges have observed sentencing disparities for individual Indians prosecuted under the Major Crimes Act. For example, this judge's first experience with this disparity and obvious prejudice to a defendant came during consideration of United States v. Deegan, 605 F.3d 625 (8th Cir.), rh'g denied, 634 F.3d 428 (8th Cir. 2010), and cert. denied, 563 U.S. 938 (2011).[7] The government prosecuted Deegan, an Indian woman and mother of three young daughters, for a crime in Indian Country within the State of North Dakota. Id. at 627. Deegan committed a type of homicide rarely considered in federal court called neonatacide. Id. at 642-45 (Bright, J., dissenting). Namely, Deegan suffered terrible abuse throughout her life and, in desperation likely stemming from years of abuse, Deegan gave birth to a child in her home and permitted the newborn to die shortly after birth. Id.

A grand jury returned a federal indictment charging Deegan with first-degree murder. Id. at 628 (majority opinion). Deegan entered into a written plea agreement and pled guilty to one count of second-degree murder. Id. The district court calculated Deegan's Guideline range at 121 to 151 months' (approximately 10 to 15½ years') imprisonment. Id. The district court then sentenced Deegan to more than ten years' imprisonment (121 months) without considering similarly situated defendants in the State of North Dakota. Id. at 656-58 (Bright, J., dissenting).

What was startling about the Deegan case was the contrast between Deegan's more than ten-year term of imprisonment compared to other North Dakota women who similarly committed the crime of neonatacide. Around the same time Deegan

---

[7]Deegan's case is discussed extensively in BJ Jones & Christopher J. Ironroad, Addressing Sentencing Disparities for Tribal Citizens in the Dakotas, 89 N.D. L. Rev. 53, 69-72 (2013).

committed her offense, a young student in Fargo, North Dakota permitted her newborn to die within twenty-four hours after birth. BJ Jones & Christopher J. Ironroad, Addressing Sentencing Disparities for Tribal Citizens in the Dakotas, 89 N.D. L. Rev. 53, 71 (2013). The student was prosecuted in state court and received a sentence of three-years' probation with time suspended. Id. (citing North Dakota v. N.D. State Univ. Student, No. 09-00-K-01202-1, slip op. (N.D. Dist. Ct. 2000)). A few years later, a Bismarck, North Dakota woman drowned her newborn soon after birth. Id. The woman was prosecuted in state court and received a sentence of two-years' imprisonment with time suspended. Id. at 72 (citing North Dakota v. Glum, No. 08-07-K-02741, slip op. (N.D. Dist. Ct. 2007)). More recently, another North Dakota woman committed neonaticide by drowning her newborn. The woman was sentenced in state court to one-year imprisonment with time suspended. Bryce Martin, Lindstrom to Serve No Jail Time, Gets Suspended Sentence, Bowman County Pioneer, June 14, 2014.

The comparison between Deegan's sentence of more than ten years' imprisonment and the sentences imposed upon these other North Dakota women for a similar crime is staggering. Deegan's sentence is eighty percent longer than the most stringent sentence imposed under North Dakota law and the North Dakota defendants served little-to-no time in jail.

Deegan's case serves as a graphic example of the disparity that exists because of the application of the Guidelines to Major Crimes Act cases without consideration of similar state-law sentences. More examples of this disparity exist around the country. See, e.g., United States v. Swift Hawk, 125 F. Supp. 2d 384, 384-85 (D.S.D. 2000) ("[A] person of German or Norwegian descent driving under the influence in Aberdeen, SD, would not face nearly the same penalties as a Native American driving on one of the reservations in South Dakota. Why Congress would have done this is beyond me."). And federal prosecutors and defenders hear and express concerns that Indians are sentenced more harshly under federal law. TIAG Report at 19 & n.21.

Scholarly research provides a second source of information regarding the disparity in sentences for Indians convicted under the Major Crimes Act. Many legal scholars have researched and observed sentencing disparities in Major Crimes Act cases. Some scholarly articles on this topic include: Jones & Ironroad, supra, at 68-72; Lindsey Trainor Golden, Note, Embracing Tribal Sovereignty to Eliminate Criminal Jurisdiction Chaos, 45 U. Mich. J.L. Reform 1039, 1061-64 (2012); Emily Tredeau, Comment, Tribal Control in Federal Sentencing, 99 Cal. L. Rev. 1409, 1416-17 (2011); Timothy J. Droske, Correcting Native American Sentencing Disparity Post-Booker, 91 Marq. L. Rev. 723, 728-46 (2008); Gregory D. Smith, Comment, Disparate Impact of the Federal Sentencing Guidelines on Indians in Indian Country, 27 Hamline L. Rev. 483, 509-22 (2004); Nora V. Demleitner, First Peoples, First Principles: The Sentencing Commission's Obligation to Reject False Images of Criminal Offenders, 87 Iowa L. Rev. 563, 574-79 (2002); Sands, supra, at 144-47.

A third body of evidence documenting this disparity comes from advisory groups formed by the U.S. Sentencing Commission (Commission). In 2002, the Commission formed the Native American Advisory Group (NAAG) to research whether disparate sentences were imposed under the Major Crimes Act. NAAG Report at 10. NAAG issued a report concluding that a disparity gap existed for many Indians prosecuted under federal law. Id. at 19-25, 30-33. NAAG asked the Commission to take certain actions to diminish the sentencing impact on Indian defendants convicted under the Major Crimes Act, id. at 39, but the Commission failed to take any action in response to the NAAG Report, Jones & Ironroad, supra, at 67-68.

More recently, the Commission formed the Tribal Issues Advisory Group (TIAG) which issued its report in May 2016. TIAG Report at 18. In its report, TIAG found that "many Native Americans, federal prosecutors, federal defenders, and some federal and state judges . . . believe that Indians receive different sentences than do

non-Indians who commit the same or similar crimes." Id. at 19. TIAG concluded that "[r]egardless of the existence of supporting statistics, widespread perceptions of unfair sentencing merit serious discussion" because " '[p]erceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system.' " Id. at 20 (quoting Diana E. Murphy et al., U.S. Sentencing Comm'n, Cocaine and Federal Sentencing Policy 103 (2002)). TIAG further opined that data "hint[ed] at disparity and underscore[d] the need for more targeted information." Id. at 21-24.

Ultimately, however, TIAG concluded that "data limitations . . . prevent a systematic and comprehensive exploration" into the "[d]ifferences in sentencing arising from the different ways federal and state law treat the same crime." Id. at 21. TIAG recommended the Commission take steps to collect this information because, absent reliable data collection, the Commission is unable to provide "a federal criminal justice system that is free of unintentional sentencing disparities toward Native Americans." Id. at 28-29.

In light of the wealth of evidence that disparities in sentences exist for Indians convicted under the Major Crimes Act, action must be taken to ensure all defendants receive fair sentences. However, while TIAG's recommendation to seek more data on this issue is well taken, the TIAG Report merely scratches the surface for a resolution to this unfair and prejudicial system. It is, therefore, incumbent upon the federal courts to reduce these disparities even without action by the Commission.

Steps can, and should, be taken to reduce disparities in sentences under the Major Crimes Act and are supported by precedent. Namely, many disparities in sentences could be avoided if district courts were encouraged, if not required, to consider sentences imposed and time actually served for similar state-law crimes when sentencing Indian defendants under the Major Crimes Act.

## C.    Solution

As stated above, a limited resolution to the disparity problem is to require district courts to take into account sentences and actual time served for similar state-law crimes along with calculating a sentence under the Guidelines.  My position is supported by this Court's precedent.

In 1990, we faced the question of whether the Guidelines passed in 1984 applied to crimes under the Major Crimes Act.  Norquay, 905 F.2d at 1159-60. Ultimately, we concluded the Guidelines applied.[8]  Id. at 1161.  But in so holding, we noted that application of the Guidelines did "not defeat Congress' desire that Indians and non-Indians committing the same crime be subject to the same punishment."  Id. (emphasis added).  Instead, we held that the Guidelines apply to crimes committed under the Major Crimes Act, "but that the sentence imposed may not exceed any maximum sentence and may not fall below any mandatory minimum sentence that is required under the law of the state in which the crime occur[ed]."  Id. (emphasis added).

This Court's holding in Norquay has been applied in a number of Circuits. See, e.g., United States v. Male Juvenile, 280 F.3d 1008, 1024 (9th Cir. 2002); United States v. Wood, 386 F.3d 961, 963 (10th Cir. 2004).  Further, the Circuits "unanimously agree" that under the Assimilative Crimes Act state sentencing ranges should set minimum and maximum lengths for federal prison terms.  United States v. Martinez, 274 F.3d 897, 906 & n.12 (5th Cir. 2001) (listing cases).  Yet, in this Circuit, we sometimes tell district courts they have no obligation to consider sentences for similar state-law crimes when a defendant is convicted under the Major

_____

[8]As stated above, later in 1990 Congress codified this Court's holding that the Guidelines applied to the Major Crimes Act by amending the statute.  Crime Control Act of 1990, Pub. L. No. 101-647, § 1602, 104 Stat. 4789 (1990).

Crimes Act.  See, e.g., Deegan, 605 F.3d at 635-36 ("It would have been an error for the district court to consider potential federal/state sentencing disparities").  This approach often results in unfair, prejudicial sentences like the sentence imposed upon Lasley.

This case presents a good example of how consideration of sentences for similar state-law crimes would likely result in a lower sentence for Indian defendants.  Here, a jury convicted Lasley of two counts of second-degree murder for crimes committed on an Indian reservation within the border of the State of Iowa.  Under Iowa law, the mandatory sentence for second-degree murder is fifty-years' imprisonment.  Iowa Code § 707.3; Michael R. Mullins, Office Iowa State Pub. Def., Iowa Criminal Statutes Summary Chart 2 (2013), available at https://spd.iowa.gov/ sites/files/spd/documents/Mullins%202013.pdf.  An individual is eligible for parole after serving seventy percent of his/her sentence—meaning an individual convicted of second-degree murder is eligible for parole after thirty-five years.[9]  Mullins, supra, at 2.

In contrast to Iowa, Lasley's federal Guideline range was 360 months' (30 years') to life imprisonment, without the possibility of parole.  Without considering the general fifty-year sentence for second-degree murder convictions under Iowa law, the district court imposed the maximum sentence permitted by the Guidelines as though the crimes were first-degree murder.  Thus, Lasley will be incarcerated the rest

_____

[9]It is true that Iowa law permits consecutive sentences when a person is "sentenced for two or more separate offenses."  Iowa Code § 901.8.  Thus, for two counts of second-degree murder under Iowa law, Lasley could serve one-hundred-years' imprisonment with the possibility of parole after seventy years.  See Mullins, supra, at 2.  But, to date, there is not a single example of an individual being convicted of two counts of second-degree murder and serving consecutive sentences.  Email from Steve Michael, Divisional Adm'r, Iowa Dep't of Human Rights, to Heather Quick, Assistant Fed. Pub. Def. (Jan. 4, 2016, 13:25 CST).

of his life when there would be a strong probability of release before death had he committed the crimes off the reservation. Such a result undermines the purpose of the Major Crimes Act, to ensure "Indians and non-Indians committing the same crime be subject to the same punishment," Norquay, 905 F.2d at 1161, and permits district courts to ignore 18 U.S.C. § 3553(a)'s commands to "provide just punishment" and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," see Deegan, 605 F.3d at 651, 656-58 (Bright, J., dissenting).

The time has come for federal courts to take action to avoid unwarranted sentencing disparities for individuals like Lasley. Federal courts must take into account sentences and actual time served for similar state-law crimes when sentencing under the Major Crimes Act to ensure Indians in Indian Country do not receive drastically increased penalties for crimes traditionally handled in state or tribal court. This is an important first step to resolve the underlying disparities that result from prosecutions under the Major Crimes Act. For this reason, I would remand to the district court for consideration of Iowa state law and practice when imposing Lasley's sentence.

## II.

The second legal infirmity presented is this Court's precedent that "the Constitution does not preclude a district court from considering acquitted conduct in sentencing a criminal defendant." United States v. Papakee, 573 F.3d 569, 576 (8th Cir. 2009).[10] This case presents a straightforward example of why the use of

---

[10]This Court's precedent relies upon the Supreme Court's opinion in United States v. Watts, 519 U.S. 148, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997) (per curiam). United States v. Whatley, 133 F.3d 601, 606 (8th Cir. 1998). But Watts does not stand for this broad proposition. In Watts, the Supreme Court addressed the "very narrow question" of whether the Double Jeopardy Clause was violated when the

acquitted conduct to enhance a defendant's sentence should be deemed unconstitutional under both the Sixth Amendment and the Due Process Clause of the Fifth Amendment. See id. at 577-78 (Bright, J., concurring); United States v. Canania, 532 F.3d 764, 766-78 (8th Cir. 2008) (Bright, J., concurring).

Many federal judges have expressed the view that the use of acquitted conduct to enhance a defendant's sentence should be deemed to violate the Sixth Amendment and the Due Process Clause of the Fifth Amendment. Jones v. United States, – U.S. –, 135 S. Ct. 8, 190 L. Ed. 2d 279 (2014) (Scalia, J., joined by Thomas & Ginsburg, JJ., dissenting from the denial of cert.); United States v. Bell, 808 F.3d 926, 928-32 (D.C. Cir. 2015) (Millett, J., concurring in denial of the r'hrg en banc); Papakee, 573 F.3d at 577-78 (Bright, J., concurring); United States v. White, 551 F.3d 381, 386-97 (6th Cir. 2008) (Merritt, J., dissenting); Canania, 532 F.3d at 776-78 (Bright, J., concurring); United States v. Mercado, 474 F.3d 654, 658-660 (9th Cir. 2007) (Fletcher, J., dissenting); United States v. Faust, 456 F.3d 1342, 1349-53 (11th Cir. 2006) (Barkett, J., concurring); United States v. Pimental, 367 F. Supp. 2d 143, 149-55 (D. Mass. 2005).

In recent years, the Supreme Court directly held the Sixth Amendment, together with the Fifth Amendment's Due Process Clause, "requires that each element of a crime" be either admitted by the defendant, or "proved to the jury beyond a reasonable doubt." Alleyne v. United States, – U.S. –, 133 S. Ct. 2151, 2156, 186 L. Ed. 2d 314 (2013). Any fact that increases the penalty to which a defendant is

---

district court considered acquitted conduct while sentencing the defendant under the Guidelines. United States v. Booker, 543 U.S. 220, 240 & n.4, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). In Booker, the Supreme Court held Watts did not address whether the use of acquitted conduct generally violates the Sixth Amendment. Id. Because Watts does not bind this Court regarding the propriety of using acquitted conduct at sentencing under the Sixth Amendment and the Due Process Clause of the Fifth Amendment, I question whether this Court's precedent is correct.

exposed constitutes an element of a crime, <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and "must be found by a jury, not a judge," <u>Cunningham v. California</u>, 549 U.S. 270, 281, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007). Thus, as articulated by some federal judges, recent precedent regarding the Sixth Amendment and Due Process Clause of the Fifth Amendment supports the conclusion that a district court violates a defendant's constitutional "rights by making findings of fact that either ignore or countermand those made by the jury and then rel[ying] on these factual findings to enhance the defendant's sentence." <u>Canania</u>, 532 F.3d at 776 (Bright, J., concurring).

Beginning with the Sixth Amendment, in the past two decades, the Supreme Court has emphasized the central role of the jury in the criminal justice system. <u>Id.</u> (listing cases). The right to trial by jury is designed to guard against oppression on the part of the Government. <u>Duncan v. Louisiana</u>, 391 U.S. 145, 155, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). Thus, once a defendant chooses to exercise his/her jury-trial right, the government cannot deprive a defendant of liberty absent express permission from the defendant's fellow citizens. <u>See</u> <u>Blakely v. Washington</u>, 542 U.S. 296, 305-06, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) (holding the jury-trial right is a "fundamental reservation of power in our constitutional structure").

Yet, under this Court's current precedent, we permit a district court to ignore express findings by the jury under the assertion that the fact is a mere "sentencing factor."[11] In so doing, we not only give the government a "proverbial 'second bite at

---

[11]To be sure, the Supreme Court generally permits judicial fact-finding by preponderance of the evidence at sentencing that goes beyond the elements of the crime. <u>See, e.g.</u>, <u>United States v. O'Brien</u>, 560 U.S. 218, 224, 130 S. Ct. 2169, 176 L. Ed. 2d 979 (2010). But these precedents do not resolve the greater question of whether the Sixth Amendment and the Due Process Clause of the Fifth Amendment permit a district court to increase the length of a defendant's sentence "based on facts that were <u>submitted directly to and rejected by</u> the jury in the same criminal case."

-19-

the apple' " on counts it failed to prove to the jury, but also "entirely trivialize[] [the jury's] principal fact-finding function." Canania, 532 F.3d at 776 (Bright, J., concurring). By "[p]ermitting a judge to impose a sentence that reflects conduct the jury expressly disavowed," a district court is free to interfere with a defendant's Sixth Amendment rights by directly contradicting the findings of the jury to enhance a defendant's sentence. Id.

With regard to the Fifth Amendment, the Supreme Court held that "[d]ue process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (alteration in original) (quoting Speiser v. Randall, 357 U.S. 513, 525-26, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958)). Due process further requires the government to provide adequate notice as to the appropriate sentences stemming from a factfinder's determination. Cf. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S. Ct. 652, 94 L. Ed. 865 (1950) ("[T]here can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.").

As stated before, "consideration of 'acquitted conduct' undermines the notice requirement that is at the heart of any criminal proceeding." Canania, 532 F.3d at 777 (Bright, J., concurring). "In determining guilt or innocence, the jury . . . serves not only as a fact-finder but as a means of providing a defendant with notice as to his possible punishment." Id. Permitting a district court to nullify a jury's not guilty verdict, with respect to any given charge, by allowing the judge to use the same conduct to enhance a defendant's sentence eviscerates this notice function and "cannot possibly satisfy due process." Id.

_____

Bell, 808 F.3d at 930 (Millett, J., concurring in the denial of r'hrg en banc).

-20-

Examining the present case highlights the unconstitutionality of using acquitted conduct to enhance a defendant's sentence. Here, a jury expressly found Lasley not guilty of first-degree murder—namely, Lasley did not commit murder willfully, deliberately, maliciously, or with premeditation and malice aforethought. See 18 U.S.C. § 1111. The district court, in direct contradiction to this finding, concluded that "Murder in the First Degree was established . . . by preponderance of the evidence." Thus, the district court described Lasley's crime as "premeditated" and indicated the "starting point" for Lasley's sentence was "a life sentence."

In the mind of the district court, therefore, Lasley's advisory Guideline range went from a choice of 360 months' (30 years') to life imprisonment, to a presumptive sentence of life imprisonment. Such findings do not protect Lasley's right under the Sixth Amendment to have a jury find every element that will increase his sentence beyond a reasonable doubt. See Apprendi, 530 U.S. at 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435. Neither did the district court's findings protect Lasley's guarantee under the Due Process Clause of the Fifth Amendment that he is entitled to fair notice of the precise effect a jury's verdict will have on his punishment. See Canania, 532 F.3d at 777 (Bright, J., concurring).

Therefore, in my view, the time has come to protect a defendant's rights under the Sixth Amendment and Due Process Clause of the Fifth Amendment, and overrule existing precedent permitting the use of acquitted conduct to enhance a defendant's sentence. For this reason also, I would remand for the district court to resentence Lasley consistent with this view.

**CONCLUSION**

This case presents yet another example that our sentencing system is broken[12] and a new approach must be taken. United States v. Fry, 792 F.3d 884, 893 n.2 (8th Cir. 2015) (Bright, J., concurring in part and dissenting in part); United States v. Noriega, 760 F.3d 908, 912 (8th Cir. 2014) (Bright, J., concurring); United States v. Stokes, 750 F.3d 767, 772-73 (8th Cir. 2014) (Bright, J., concurring); United States v. Hiveley, 61 F.3d 1358, 1363-66 (8th Cir. 1995) (Bright, J., concurring). Lasley committed a grievous offense. But that does not give federal courts the right to ignore Lasley's constitutional rights or to punish Lasley more harshly than a white defendant because of Lasley's status as an Indian in Indian Country. For these reasons, I respectfully dissent.

I suggest that Supreme Court review of these important sentencing issues may be appropriate.

————————————————————

---

[12]The Executive Branch has also described the federal sentencing system is "broken." See Neil Eggleston, White House Counsel to the President, *President Obama has Now Commuted the Sentences of 348 Individuals*, White House (June 3, 2016, 3:30 PM), https://www.whitehouse.gov/blog/2016/03/30/president-obama-has-now-commuted-sentences-348-individuals; Eric Holder, Attorney General of the United States, United States Department of Justice, Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013), available at http://www.justice.gov/iso/opa/ag/speeches/2013/ag–speech–130812.html.